20-1830 from the Eastern District of Arkansas. Alvin Jackson v. Dexter Payne. All right, Mr. Jacobs. Good morning, your honors, and may it please the court. My name is Dylan Jacobs. I'm an assistant solicitor general for the state of Arkansas, and I represent the appellant, Dexter Payne. In 2016, the district court considered the totality of the available evidence, and relying chiefly on the state's expert, Dr. McFaugh, concluded that Alvin Jackson failed to show by a preponderance of the evidence that he is intellectually disabled under Arkansas law. After remand from this court in light of the Supreme Court's opinion in Moore v. Texas, the district court changed its conclusion. The evidence before the district court did not change between 2016 and 2020, nor did the weight the district court gave to any of that evidence, including its credibility findings regarding the expert witnesses. What did change was the legal standard the district court believed it was required to apply based on its interpretation of this court's prior opinion. And the following can be found on page 44 of the district court's opinion, where it states that it interpreted this court's opinion as directing it to find for Jackson, if he, quote, produced an IQ score between 70 and 75, and showed that he had a significant adaptive deficit as a child, such as a learning disability. In light of that, it concluded that it was required to ignore wide swaths of probative evidence, including Dr. McFaugh's clinical assessment of Alvin Jackson, and his opinions about the unreliability of Jackson's life as an adult. This was error, and this court should either enter judgment in favor of the state based on the evidence already in the record, or at least reverse and clarify the evidence that the district court is allowed to consider on remand. If I could proceed first with the adaptive deficits prong of Arkansas's law under the functioning prong. So Arkansas law requires an inmate to prove by a preponderance of the evidence that he has significant adaptive deficits that developed prior to the age of 18 and which persisted at the time of the crime. In its 2016 opinion, the district court looked at the totality of the available evidence regarding Jackson's functioning, including his life as an adult. However, on remand, the district court interpreted this court's opinion as entirely precluding it from considering any evidence about Jackson's behavior as an adult because he was in prison. And that we believe was error. Nothing more or in this court's prior opinion entirely precluded the district court from considering the only available evidence regarding Jackson's adaptive functioning as an adult. And while this court did caution the district court against placing too much reliance on Jackson's adaptive strengths that he may have demonstrated in prison, this court didn't go so far as to require the district court to completely ignore Jackson's adult life. Did the district, this is Jed Smith, did the district court make any findings about adaptive deficits at the time of the crime? No, your honor. In its 2020 opinion, it did not because it specifically said that it was ignoring any of Jackson's behavior as an adult because he was incarcerated for all but a very brief time of his adulthood, including when he committed the second murder in prison. So, as far as the district court's 2020 opinion, the district court didn't consider his adaptive functioning as an adult, which is part and parcel of Arkansas's requirement under the Adkins standard. It isn't simply whether adaptive deficits are developed during childhood, they must also continue on into adulthood at least to the time of the crime in this case. So, it wouldn't make any sense to entirely exclude that, even though Jackson was incarcerated. And Moore did caution against relying on evidence of an functioning in the free world, for example. And the district court obviously didn't do that because there's really no free world behavior of Jackson's that it had available to analyze in this case. So, we think the district court was entitled to look at the best and only evidence available of Jackson's adaptive functioning as an adult and at the time of his second murder for which he was sentenced to death. If I could move to the significantly sub-average general intellectual functioning prong. In its 2016 opinion, the district court applied the plus or minus five point standard of error measurement as was required under Hall versus Florida. And it ultimately concluded that Jackson's IQ scores did not preclude a finding of intellectual disability but weren't conclusive as such. And it went on to credit Dr. McVaugh's opinion that Jackson's intelligence fell within the low to mid-borderline range and it ultimately found that Jackson did not meet his burden of proof to show that he has significantly sub-average general intellectual functioning as required under Arkansas law. Now, on remand, the district court believed that so long as Jackson produced IQ scores that were or even an IQ score in the 70 to 75 range that not only was he entitled to move on to the adaptive deficits prong and provide evidence on that which is in line with Hall versus Florida but that the district court was required to ultimately find that he satisfies the sub-average general intellectual functioning prong and that we think was error. We think the district court was correct in its 2016 opinion that even though Jackson was allowed to put on evidence of adaptive functioning that ultimately the district court could still credit Dr. McVaugh's opinion and ultimately conclude that Jackson did not meet his burden of proof to show significantly sub-average general intellectual functioning. We think it was error to conclude solely based on Jackson's IQ scores that he meets that requirement and we think first that the district court was allowed to give weight as it did in 2016 to Dr. McVaugh's concerns about the validity of Jackson's childhood IQ scores and second, the district court was entitled to rely on Dr. McVaugh's clinical assessment of Jackson's intellectual abilities including his in-person meetings and his evaluation of the entire body of evidence available outside of Jackson's childhood IQ scores and indeed this court said in Ortiz versus United States that the test scores standing alone cannot support a diagnosis and nothing in the Supreme Court's opinions in Hall versus Florida or Moore versus Texas changed that. So we think that the district court was entitled to consider a much wider body of evidence than it believed that it was permitted to consider in light of this court's opinion. What would that wide body of evidence include? So the chiefly and most important I think is all the evidence about Jackson's functioning as an adult which Dr. McVaugh discusses in great detail in his expert report and I think the district court's entitled to consider that keeping in mind this court and the Supreme Court's direction about the weight that can be placed on such evidence in a prison setting and Dr. McVaugh in his opinion and his testimony is aware of those considerations and admits that you have to take that evidence in the light that it's presented since it is in prison. There are certainly differences in an inmate's capability to function in an institutionalized setting versus out in the free world but here we don't have evidence of Jackson's ability to function as an adult outside of prison and so we have to go with what evidence is available regarding his adaptive functioning and Dr. McVaugh goes into that. It includes not only his clinical assessment but Jackson's writings in prison, telephone conversations that were recorded which Dr. McVaugh listens to and evaluates as to both his intellectual functioning and his adaptive abilities and we think the district court was entitled to consider all of that and weigh that evidence in making its ultimate determination as to whether Jackson meets the requirements of the Supreme Court. I would like to turn to a question I have regarding the burden of proof and I'm hoping maybe your opposing counsel can address this as well. The Supreme Court has directed that the district court's determination has to be informed by the views of medical experts and here there is only one medical expert that the district court credited and that was Dr. McVaugh and he said that the record contained too few data to arrive at a valid opinion with regard to adaptive functioning at age 18. So my question is this, can inconclusive adaptive functioning evidence showing as to intellectual disability, can it show that as by a preponderance of the so in other words if you've got you've only got one medical expert that was credited and he said the data is inconclusive in order so that I can't really tell whether there was this adaptive functioning deficit by age 18. How do you prove by a preponderance of evidence that there was an adaptive functioning deficit given that scenario? So in this case your honor I don't believe that you can. If the expert testimony below had been different certainly but as it stands in this record the district court did decline to credit any of Dr. Moneypenny's testimony, found it entirely unhelpful and credited Dr. McVaugh's observations and in 2016 the district court came to the same conclusion that Dr. McVaugh did which was that the district court did not find that Jackson was not intellectually disabled by a preponderance of the evidence. It simply concluded that Jackson had failed to meet his burden of proof to show that he was which is the requirement under Arkansas law and so that's why we think that rather than remand this court is certainly entitled to simply enter judgment in favor of the state on this point based on evidence in the record. If there are no further questions I'd like to reserve the balance of my time. Thank you Mr. Jacobs. Mr. Rosenzweig you're muted. Yes we can hear you now. Thank you your honor. I'm Jeff Rosenzweig. May it please the court I'm Jeff Rosenzweig and I represent Mr. McVaugh. First let's talk about what's not really an issue. There's no question and Dr. McVaugh concedes that Mr. Jackson's brain is not right. That he had a bad brain and that the question boiled down to whether you could call it a retardation of intellectual disability or something else. He also said that he could not render a forensic opinion that he was either intellectually disabled or not although he had a clinical opinion that he was not. He did concede that if he is it's not by much and if he's not it's not by much. In other words, it is a even with Dr. McVaugh it was a so-called close call. There's a clear error standard at this point on the factual question of retardation or intellectual disability. Judge Wright who was not writing on a blank slate at all found that in fact he met the Atkins and Atkins-Proseny criteria. There is no requirement for magic words and if you look at everything Judge Wright found in the context of everything the court did not did not err. The court should this court should affirm the district court's opinion first with regard to the IQ tests. The childhood IQ tests were not a one-off. He was caught early by the Little Rock School District and repeatedly tested. There are five or six or seven or eight references in the record testing as a child and as a and as a tween and as a young and as a young teenager. Furthermore, in addition to the actual records, this testimony was deduced in his in the penalty phase in the cold flasher trial. So this is not just something that mysteriously one test from childhood that mysteriously parachuted in. It was any number of things that were essentially consistent in their findings and and with the the SEM that was certainly adequate for Judge Wright district court to find what what the to the test to the childhood onset the onset before 18. I don't think anyone seriously disputes that whatever Mr. Jackson has that there was no that that I think everyone would agree that it occurred before the age of 18. The myriad of records and Dr. McMaul's own testimony at the hearing verify that. So we clearly meet that. The question is also of course the adaptive adaptive behavior. Dr. McMaul agreed that he had the significant deficits in all of those in all of those areas. For instance, he had social problems, academic problems, communications problems. He still has all three of those in my opinion. Dr. McMaul testified to that. There's no question whatever the cause there's no question the that he suffered from adaptive behavior deficits. I agree with that question as a child. I agree with that testimony that it was significant or that they were deficits. Uh yeah he uh uh he he used at one point uh I believe the term severe uh but I think it's implicit uh in uh in what he uh in his uh in his observations uh and certainly I believe it's going implicit in uh judge Wright's uh observations concerning this. The uh uh and uh again the district court was not writing on a uh blank slate on this and you see in those uh in those uh as significant as severe. Mr. Rosenzweig. Yes. This is this is Judge Smith. What adaptive functioning deficits uh are there in the record around the time of the commission of the crime? Well did the district court make findings as to any adaptive deficits around that time? The problem the problem was of course that he was uh you know he was uh locked up in a maximum security prison uh that may in which uh which all your uh uh needs are taken uh essentially or you're uh you're compelled to do whatever it is you're uh uh you're compelled to do. You don't make your own meals, you don't drive a car, you don't uh write a check or anything else like that uh and so as as the DSM-5 uh instructs uh you have to go to uh what you do have and what you do have is is uh for instance all those uh all the testimony or all the records and all the uh with regard to uh his earlier life uh outside of prison uh because uh it's almost impossible to get those figured out from a uh you know uh in the context of a maximum. So is is it your sense that the district court concluded it could use absolutely no uh evidence as to adaptive functioning during uh the appellant's prison period or that it simply should not be uh given great weight? Uh your honor uh the what happened before was uh and and uh one reason the court reversed is that uh is the district court had looked at the strengths without looking uh without looking at the uh uh at the deficits uh and some of the uh so-called adaptive adaptive strengths were not uh were not really so. For instance uh that uh the recorded conversations that Dr. McBall agreed uh that it did that uh that uh he appeared not to understand this uh were being recorded and secondly his conversations were mostly uh assents to what other people were saying. In your representation did you put forth into the record any evidence of adaptive deficits? Um well uh you know we uh Dr. uh Dr. Moneypenny uh testified uh to those of course Dr. uh the district court did not credit uh uh Dr. uh you know Dr. Moneypenny and but but the probably again the problem is uh the bigger problem is um trying to establish those the extent one can uh in the context of a maximum security prison that again that's why DSM uh says you look at the other uh. I just I understand that difficulty but I'm just wondering what was put in record um so you could highlight that. Uh well it would be uh uh it would be in uh in Dr. uh I believe there'll be some in Dr. Moneypenny's uh testimony concerning uh concerning what he uh what he uh what he found and that there had not been uh there had not been uh a particular change uh from uh from uh from his childhood uh from his childhood situation. Uh I believe Dr. uh McVaugh testified uh you know that uh similarly that the type of things that uh that he would have seen were not the type that would necessarily uh improve. This certainly would not improve in prison um but again he was uh the problem is of course he was you know he was locked up uh uh in a you know in a cell by himself uh for uh for uh for almost all of this time and of course uh has continued has been on death row now for uh since the quarter of a century um and uh and I'm not sure I uh I dealt with Judge Grass's uh question that you wanted both council uh to do so if uh or uh but uh with regard to uh uh with regard uh to that of the the it's not it's not a question of only medical uh medical opinions but one looks at all the other factors that uh that that are are available uh to be looked at uh and under the circumstances of this case it was uh we submit it was certainly not clear error uh for uh the district court to that uh he met the uh the Acton's requirements uh Acton's uh uh and his progeny of course deal with the fact that uh this is a uh this is a lifetime uh affliction uh that will that will that affects uh everything the maturation process and the uh and the process of living uh and uh and uh and does have and renders uh renders the execution uh violation of the eighth amendment there's no question that uh Mr. Jackson is going to live the rest of his life in prison almost certainly in a uh maximum security setting uh not only because of the cold pleasure of homicide but also uh if this court affirms the district court it's still a you know it's a life without parole sentence uh and uh again uh Dr. Dr. McMaugh's testimony uh gives the court again give the district court sufficient information and may make sufficient concessions uh to his uh with regard to uh Mr. Jackson's uh capabilities and with regard to the record uh that the court did not clearly err uh the court should affirm uh the court should certainly not enter judgment for the state the court has questions or feels that the district court applied uh some sort of improper calculus uh then the court should uh remand back to the district court for whatever counsel uh let me go back to something that was mentioned earlier in this issue of adaptive functioning and uh how the court is permitted to weigh adaptive strengths against deficits um what's your what's your view how should we what's our takeaway on that is the court not to consider adaptive strengths is the court to compare strengths and deficits what's the what's the proper analysis uh well that's something that that's kind of uh it's a thread that goes through these cases yes uh well uh the the of course the cases that have been reversed the ones that were were to have considered only are the ones that appear to consider strengths without considering uh the adaptive deficits uh i think it's uh uh i i think that uh you know i would uh i would like to argue that you can consider only the adaptive deficits in this circumstance but even if you were to consider both uh it's uh it is uh it is something of an art it's not a scientific uh principles but uh the uh the well well is that i guess let me ask it this way is that is the question i just asked you is that a legal question or is it a medical actually a scientific question and if it's the latter what does the medical community say about that or is it or is anything about that in the record uh i don't uh i'm not sure uh i'm not sure it's in the uh in the record i mean uh dsm5 uh talks about uh looking at uh looking at both uh the uh more uh more wants to ensure that you uh that you look at the uh at the at the deficits um even if you were to uh and i think that's probably the best answer i can give you i notice my time is up but my council uh continuous response you can you can you can answer the question okay i i think i uh uh with regard uh well the the the definition of intellectual disability is a legal question the question uh question of application of law uh the question of of whether a person is in fact intellectually disabled is a is a fact question which everything has to be uh weighed according to the law and the law the law certainly uh permits and in fact instructs that you consider the uh that you consider the adaptive deficits along with uh along with strengths and do not give too much uh emphasis or credit solely to whatever strengths may be perceived to exist thank you mr rosen swag mr jacobs here above uh thank you your honor uh judge shepherd if i could if i could start with with an answer to your question uh i would direct the court to footnote eight of the supreme court's opinion and more uh which which discusses uh the clinicians considering adaptive strengths alongside adaptive weaknesses especially within the same uh adaptive skill domain um and what it says that that they're they're the more does not permit is quote permitting the arbitrary offsetting of deficits against unconnected strengths so i i think what what more says that uh the courts can't do is say an inmate is strong in so many of these areas uh so so his his adaptive deficits that exist in other areas just don't don't matter um and i i don't uh and that's what's not permitted um and so if i could go um uh to the adaptive functioning issue here the district court uh we think what the problem is is that it explicitly isn't that exactly what the district court did in the uh in in the previous decision um i don't i don't necessarily think that that's what the district it's just a listing well here are the here are the deficits but on the other hand look at this this is uh you know these are the strengths no i don't think that's why he filed a prisoner he filed a prisoner lawsuit he filed grievances um your honor i think in somewhat of actually an arbitrary nature without any kind of discussion or actual comparison so um you are i i don't think that the district court explicitly did that i don't think the district court said that it was offsetting deficits because of strengths i think it is um a difference to say uh that the district court looked at the totality of uh jackson's is in making its ultimate determination including strengths and weaknesses um i see that my time is thank you mr jacobs unless there are any other questions uh we will consider the argument complete the court wishes to thank both counsel for providing argument today to the court in supplementation to the briefing that's been submitted we will take the case under advisement councilman be excused thank you